# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 08-31553 |
| | ) | |
| WILKES STREET REALTY | ) | |
| TRUST, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| WILKES STREET REALTY | ) | Adversary Proceeding |
| TRUST, | ) | No. 09-03024 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HALLINAN CAPITAL CORP. | ) | |
| AND REGIONAL FINANCING | ) | |
| CO., LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF DECISION

Before the Court is a "Complaint for Breach of Good Faith and Fair Dealing,
Fraud, Massachusetts General Laws Chapert [sic] 93A Damages, and For Related and
Other Relief" (the "Complaint") filed by Wilkes Street Realty Trust, the debtor in this
Chapter 11 case (the "Debtor" or "Trust").  In the six-count Complaint, the Debtor seeks,
on various grounds, damages from Hallinan Capital Corporation ("Hallinan") and
Regional Financing Co., LLC ("Regional") (together, the "Defendants"), arising from (i)
Hallinan's requirement that the Debtor execute and deliver to Hallinan a deed in lieu of

foreclosure at the origination of the Debtor's mortgage to Hallinan; and (ii) payments made to Hallinan and Regional that the Debtor claims were fraudulent transfers or otherwise improper.

I.    FACTS AND TRAVEL OF THE CASE

In early 2006, Jerry and Tiffany Carr (together, the "Carrs") became interested in purchasing and rehabilitating property at 37 Wilkes Street, Springfield, Massachusetts (the "Property"). The Carrs, who had some experience with similar real property rehabilitation projects in western Massachusetts, envisioned developing the Property into a church, daycare center, and bookstore/coffee shop and four house lots in the rear. The Property already included a partially built church, but was otherwise overgrown, landlocked, and had accumulated significant outstanding real estate taxes.[1] The Carrs formed the Wilkes Street Realty Trust to hold the Property, naming Tiffany as trustee and both Tiffany and Jerry as beneficiaries of the Trust.[2] The Carrs retained Attorney Elin Gaynor ("Attorney Gaynor") to represent the Carrs and the Trust in the acquisition of the Property.

The Carrs' plan was to obtain 100% financing to purchase and develop the Property. That development would necessarily include purchasing an abutting property in order to provide the needed frontage and ultimately subdividing the rear portion of the property into the four separate house lots. They engaged Regional -- a company that

---

[1] The Carrs testified at trial that the value of the Property, if completed, was worth no more than $500,000-$550,000. But on the Debtor's Schedule A—Real Property, the Property was valued at $650,000.

[2] Tiffany testified that she was named trustee because the Carrs believed Jerry's poor credit history made him ineligible for such a role.

specializes in brokering short-term financing deals for real estate developers -- to help them attain the necessary financing.[3]

Joseph Giuttari, the sole owner of Regional, was successful in brokering that financing from Hallinan.[4]  Hallinan conditioned the financing, however, on the Debtor's willingness to execute and deliver a deed in lieu of foreclosure (the "Deed in Lieu") at the closing.  Attorney Frank Tassoni ("Attorney Tassoni"), who represented Hallinan with respect to this loan transaction and prepared the corresponding documents,[5] warned Regional that the Deed in Lieu might not be effective because, *inter alia*, the Deed in Lieu was not accompanied by an estoppel affidavit.

On September 29, 2006, the Debtor executed and delivered a mortgage to Hallinan (the "Hallinan Mortgage") as security for a loan represented by a promissory note of even date in the principal amount of $345,000 and due in full (including interest) on January 29, 2007 (the "Hallinan Note").  Considering that they would need at least another $600,000 to fully develop the Property, it was always the Carrs' intention to refinance the Hallinan loan once they had made some progress on the development of the Property.  In addition to the other Hallinan loan documents, Tiffany, in her capacity as trustee, executed the Deed in Lieu.

---

[3] Tiffany, a former loan officer, testified that she believed that an institutional lender would not provide 100% financing for a purchase of the Property and its rehabilitation.

[4] Guitarri and the Carrs were well acquainted; Guitarri had previously brokered financing for the Carrs in connection with property located in Chicopee, Massachusetts (the "Chicopee Property") which they held in the "Chicopee Street Trust".

[5] While Attorney Tassoni did not represent Regional, he testified to his belief that Regional was an agent of Hallinan.

Attorney Gaynor testified that she advised the Carrs, and the Carrs understood, that the Hallinan loan was a short-term loan that did not provide enough funds to fully develop the Property and that the Carrs would need to refinance within four months of closing on the Hallinan loan.  This strategy of obtaining a series of short-term loans to carry a project to completion was described by Attorney Gaynor as the Carrs' "business model."

When the Hallinan Note came due in late January 2007, the Debtor was unable to pay the outstanding balance.  The Carrs allege that Giuttari told them that, unless a solution was obtained, Hallinan intended to record the Deed in Lieu.  The Carrs also allege that Giuttari, on behalf of Hallinan, suggested instead that the Debtor and Hallinan enter into a joint venture agreement whereby an additional lien would be created on a portion of the Property and the Debtor would pay Hallinan an additional $125,000.  Giuttari denied that a joint venture agreement was ever proposed or existed.[6]  However, Tiffany testified that on March 3, 2007, in her capacity as trustee, she executed a joint venture agreement, but did not retain a copy.  Tiffany further testified that she would not have signed the joint venture agreement but for Hallinan's threat to record the Deed in Lieu.  Hallinan never recorded the Deed in Lieu.[7]

On March 27, 2007, the Debtor obtained two new loans related to the Property and brokered by Regional.  The first loan was from Linc Investments and in the principal amount of $519,750 (the "Linc loan").  The Linc loan paid off the Hallinan Note and

---

[6]  Notably, Attorney Gaynor also testified that the Carrs never informed her of any joint venture by or between the Carrs or the Debtor and Hallinan.

[7]  Attorney Gaynor testified that after the expiration of the Hallinan Note, Hallinan took no action; it presented no demand letter, did not exercise its foreclosure rights under the mortgage, and did not record the Deed in Lieu.

Mortgage in full, leaving approximately $125,000 for continued construction on the Property.  The second loan was from Whitehall Management, Inc. and was in the principal amount of $125,000 (the "Whitehall loan").  Guittari testified that the purpose of the Whitehall loan was to pay Regional's outstanding fees.[8]   However, the Carrs testified that they believed that the purpose of the Whitehall loan was to pay the additional $125,000 to Hallinan required under the joint venture agreement and, unless the Whitehall loan documents were executed, Hallinan would record the Deed in Lieu.[9] The Debtor did not produce a copy of the purported joint venture agreement at trial. Instead, the Debtor relies on the description of a $117,839.17 payment to Regional on line 808 of the Whitehall HUD Settlement Statement, which refers to a "Joint Venture Buyout Fee."[10]

Construction with respect to the Chicopee Property was never completed and Hallinan ultimately foreclosed on that property in January 2007.[11]  On October 24, 2008, with the Linc and Whitehall loans totaling over $625,000 and insufficient capital to complete development of the Wilkes Street Property, the Debtor filed a Chapter 11

---

[8] Guittari testified: "The purpose [of the Whitehall loan] was mainly to pay off the fee that was owed to me on the Linc loan, the refinance of Linc.  It was a combination of other things being: (a) the Linc loan; (b) the savings I gained for the Carrs for that negotiation with Hallinan, which could have easily been $20,000 or $30,000 that they would have had to pay Hallinan; the fact that I also negotiated for them that Hallinan would not pursue a deficiency judgment for $200,000 on the Chicopee Property; and it was an overall one-time broker fee, if you will, just encompassing everything at that point in time."

[9] But Attorney Gaynor testified that the Linc and Whitehall loans were separate loans, neither of which was conditioned upon the other.

[10] Attorney Gaynor testified that Giuttari told her to entitle his fee a "joint venture buyout fee."

[11] After sale of the Chicopee property, Hallinan was left with a $200,000 deficiency, but did not pursue that claim against the Chicopee Trust or the Carrs.  The outstanding Chicopee note, Giuttari explained, was why Hallinan refused to refinance the Hallinan Note related to the Wilkes Street Property.

petition with this Court and continues to operate as a debtor in possession under 11

U.S.C. § 1107.[12]

A three-day trial on the Debtor's Complaint commenced on October 26, 2011. A

total of 29 exhibits were entered into evidence and five witnesses (Attorney Gaynor,

Jerry Carr, Tiffany Carr, Attorney Tassoni, and Giuittari) presented testimony.   At the

close of day 3, the Court continued the case for a fourth day to further address the

existence *vel non* of a fee agreement by and between Regional and the Debtor and/or

the Carrs.   On November 21, 2011, the parties reconvened, but no fee agreement was

produced by either party.   With no further testimony to be given or evidence to be

introduced, the Court took the matter under advisement and ordered the parties to file

proposed findings of fact, conclusions of law and any other post-trial briefs.


II.      POSITIONS OF THE PARTIES

The Complaint asserts six claims against the Defendants:   Count I: Breach of

Good Faith and Fair Dealing; Count II: Misrepresentation of Material Facts/Fraud; Count

III:  Violation of Massachusetts General Laws Chapter 93A;  Count IV:  Fraudulent

Transfer Under 11 U.S.C. § 548; Count V: Fraudulent Transfer Under Massachusetts

General Laws Chapter 109A; and VI:  Putative [sic] Damages.  Each of the claims relies

upon the allegation that Hallinan required the Debtor to execute and deliver the Deed in

Lieu contemporaneously with the execution and delivery of the Mortgage.   Counts II, IV,

and V are additionally premised upon the existence of the claimed joint venture

---

[12] All references to the "Bankruptcy Code" or to Code sections are to the Bankruptcy Code
unless otherwise specified, 11 U.S.C. §§ 101 et seq.; all references to "Bankruptcy Rule" are to
the Federal Rules of Bankruptcy Procedure.

agreement. The Defendants have generally denied each of the claims brought against them.

### A.    Breach of Good Faith and Fair Dealing (Count I)

The Debtor argues that by requiring the Debtor to execute the Deed in Lieu contemporaneously with the execution and delivery of the Mortgage, Hallinan clogged the Debtor's equity of redemption.   The Defendants argue that because the Deed in Lieu was never recorded and because Hallinan never foreclosed on the Property, the Debtor's right to redeem was never actually affected by its execution.

### B.    Misrepresentation of Material Fact/Fraud (Count II)

The Debtor asserts that by requiring the Deed in Lieu, the Defendants implied its validity and then parlayed the Deed in Lieu into the joint venture agreement.   These were material misrepresentations, the Debtor asserts, which amounted to fraud.   The Defendants contend that the Debtor failed to demonstrate that Hallinan made any representations that it either would, or legally could, record the Deed in Lieu.   Hallinan says that once the loan had matured, it never made a demand for payment and never threatened to record the Deed in Lieu.   And the Defendants further maintain that even if such representations had been made, the Debtor's reliance thereon would not have been reasonable.

The Defendants further argue that Attorney Gaynor explained the significance of the Deed in Lieu to the Carrs at the time of the Hallinan closing and the Carrs' decision to execute the Deed in Lieu was made after receiving that information.   The Defendants assert that the Carrs could have walked away from the Hallinan loan if they were unhappy with the requirement that they sign the Deed in Lieu.

Finally, the Defendants argue that even if they had represented that the Deed in Lieu was going to be recorded as a result of nonpayment, the Debtor presented no evidence that the representation would have been intended to cause the Debtor to take any action it otherwise would not have undertaken, since it was always the Carrs' intent to refinance the Hallinan loan.

### C.    Violation of Chapter 93A (Count III)

The Debtor asserts the Defendants engaged in unfair methods of competition or unfair and deceptive acts or practices as described in Massachusetts General Laws chapter 93A ("Chapter 93A") when Hallinan required the Deed in Lieu as a condition of the loan closing.  The Defendants argue that the Debtor presented no evidence that the Defendants engaged in deceptive acts within the purview of Chapter 93A; according to the Defendants, Hallinan never recorded the Deed in Lieu and Regional never threatened to record the Deed in Lieu.  Rather, the Defendants say they made every effort to help the Debtor obtain the refinancing necessary to complete development of the Property, as the Debtor planned to do from the very beginning of the project.

### D.    Fraudulent Transfer (Counts IV and V)

The Debtor contends that the payment of $117,839.17 was without fair or any consideration, as it was on account of an improperly requested and granted deed in lieu of foreclosure and other documents, namely, the joint venture agreement.  The Debtor also claims that the payment of $117,839.17 to the extent it was paid to Regional, was without fair consideration or any consideration.  These payments, the Debtor asserts, amounted to fraudulent transfers under both the Bankruptcy Code and Mass. Gen. Laws ch. 109A.

The Defendants argue that the transfer to Regional was not fraudulent because the Debtor received reasonably equivalent value.  Because the Bankruptcy Code does not define "reasonably equivalent value," the Defendants say that reasonably equivalent value should be determined based on an examination of all the facts and circumstances of the case.   The Defendants attest that Regional gave value to the Debtor by performing substantial services, including, *inter alia*, brokering loans, servicing the loans made to the Carrs, the Chicopee Trust, and the Debtor, and monitoring the construction projects.   The Defendants assert that despite performing these services for many months, Regional was not paid for these services until after the Whitehall Loan closed. According to the Defendants, the broker fee paid to Regional thus constituted reasonable and sufficient consideration.   Finally, the Defendants suggest that the Debtor presented no evidence that it was insolvent at the time the fee was paid to Regional or that it subsequently became insolvent as a result of paying Regional its fee. The Defendants point to the Debtor's Summary of Schedules filed in its underlying bankruptcy case, which shows approximately $85,000 in excess assets over liabilities. Additionally, the Defendants argue that the Debtor was not left with unreasonably small capital after the fee was paid, because after the closing on the Linc and Whitehall loans, the Debtor had an infusion of approximately $125,000 cash, as evidenced by the Carrs' continued work on the Property.   For the same reasons asserted as to Count IV, the Defendants argue that the Debtor cannot support a claim for fraudulent transfer under Mass. Gen. Laws ch. 109A.

### E.    Punitive Damages (Count VI)

The Debtor contends that punitive damages are appropriate based on the foregoing substantive claims it asserts against the Defendants.   The Defendants maintain that, generally, contract violations do not warrant the assessment of punitive damages; only conduct demonstrated as "particularly egregious" or "callous and intentional" warrants the assessment of punitive damages.   Even a finding of misrepresentation, a willful breach of a warranty or covenant, or culpability under Chapter 93A would not automatically trigger a plaintiff's right to punitive damages -- there must be something more.   The Defendants argue that the Debtor failed to provide evidence that the any of the Defendants' acts rose to a level warranting punitive damages.   Further, according to the Defendants, the Debtor failed to demonstrate that it incurred *any* damages resulting from the execution of the Deed in Lieu, as it was never recorded and was effectively extinguished through the subsequent refinancing.


### III.   DISCUSSION

### A.  Breach of Good Faith and Fair Dealing (Count I)

In Massachusetts, there is a presumption of good faith in every contract.   In Akar v. Federal National Mortgage Ass'n, Judge Gorton explained that,

> [i]n Massachusetts, every contract implies good faith and fair dealing by
> the parties in its performance. Tufankjian v. Rockland Trust Co., 57 Mass.
> App. Ct. 173, 177, 782 N.E.2d 1, 5 (2003) (footnote omitted).  This implied
> covenant provides 'that neither party shall do anything that will have the
> effect of destroying or injuring the right of the other party to receive the
> fruits of the contract[.]' Id. (quotations omitted).   Although 'the covenant
> may not … be invoked to create rights and duties not otherwise provided
> for in the existing contractual relationship,' it aims to 'guarantee that the
> parties remain faithful to the intended and agreed expectations of the

10

parties in their performance.' <u>Uno Rests., Inc. v. Boston Kenmore Realty Corp.</u>, 441 Mass. 376, 385, 805 N.E.2d 957, 964 (2004).

2012 WL 661458, *16 (D. Mass. Feb. 8 2012). "[T]he plaintiff bears the burden of presenting evidence of bad faith or an absence of good faith." <u>T.W. Nickerson, Inc. v. Fleet Nat. Bank</u>, 456 Mass. 562, 574, 924 N.E.2d 696, 706 (2010) (citing 23 S. Williston, Contracts § 63.22, at 507 (R. Lord 4th ed. 2002)).

The Debtor contends that Hallinan's requirement that the Debtor execute the Deed in Lieu contemporaneously with the Hallinan Mortgage "clogged its equity of redemption."   The right of a mortgagor to redeem property subject to a mortgage is "inherent in and essential to every mortgage, regardless of the form of the transaction, and is governed by the law where the land is located."   59A C.J.S. Mortgages § 1373. Accordingly, "[a]ny agreement in or created contemporaneously with a mortgage that impairs the mortgagor's right [to redeem the real estate] is ineffective." Restatement (Third) of Property § 3.1(b). A mortgagor cannot, "as part of the original mortgage transaction, cut off or surrender his right to redeem." <u>Humble Oil v. Doerr</u>, 123 N.J. Super. 530, 303 A.2d 898, 905 (ch. Div. 1973).   This, the Debtor asserts, makes the Deed in Lieu, which was executed contemporaneously with the Hallinan Mortgage, void and unenforceable.   But while the Debtor cites to various iterations of this theory, it fails to explain why the execution of an ultimately unenforceable and unused deed in lieu of foreclosure caused it damage in this case.

The Debtor is apparently asking the Court to conclude that Hallinan impaired the Debtor's right to redeem the Property when it required the Debtor to execute the Deed in Lieu and the Hallinan Mortgage at the same time *and* that impairing or otherwise injuring the Debtor's redemption right amounted to a breach of good faith and fair

11

dealing.  However, even if the Court were to reach that conclusion, the Debtor nowhere explains or attempts to prove that it suffered any damages as a result of this breach. The Deed in Lieu was never recorded and was eventually mooted by the refinance of the Hallinan Note and discharge of the Hallinan Mortgage.  The Deed in Lieu did not cause the Debtor to do that which it otherwise would not have done -- continue to seek short-term financing to carry the Wilkes Street project to completion.   The only conceivable harm suggested by the Debtor is the Whitehall loan, the proceeds of which went to Regional for its services.  The Carrs suggest that they were, for the lack of a better term, extorted into incurring that loan.  But this Court finds otherwise.  The funds which went to Regional were its compensation for services rendered, and the Debtor has pointed to no other payment to Regional in the subject transactions.  This Court is admittedly troubled by the reference in the Whitehall loan HUD Settlement Statement which reads "Joint Venture Buyout Fee," but the Carrs, experienced developers, have not produced a copy of the agreement or a reasonable explanation for its absence. Regional says the agreement never existed. The Debtor bears the burden of proof, and the Court cannot conjure up the terms of an agreement which one party cannot produce and the other says never existed.

In In re Ewing, that court was presented with a motion for relief from the automatic stay to reclaim appliances the movant argued she owned and was being held for her by the debtor.  39 B.R. 59 (Bankr. D. RI 1984).  The debtor testified that the movant sold the appliances to her in accordance with an alleged agreement between the movant and the debtor.  The movant denied the existence of the alleged agreement and the debtor failed to produce evidence of such.  Presented with these facts, the court

concluded that, "[b]ecause of the contradictory testimony … with no compelling reason to accept the testimony of one party in preference to the other … the issue of burden of proof is dispositive." Ewing, at 60. "The burden of proof is on the party alleging the existence of a contract." Id. (citing 29 Am.Jur.2d Evidence § 140). "Based on a close examination of the evidence, the [c]ourt conclude[d] that [the debtor] … failed to demonstrate that an agreement or any meeting of minds took place." Id. Citing the Restatement (Second) of Contracts, the court held, "'[a]n agreement is the manifestation of mutual assent on the part of two or more persons', and no such manifestation of assent occurred." Id. (quoting Restatement (Second) of Contracts § 3). Since the debtor failed to meet her burden of proof, the court found in favor of the movant.

Like the Ewing debtor, the Debtor here presented only Tiffany's testimony regarding the existence and substance of the joint venture agreement. While a hint of the existence of such an agreement is supported somewhat by the Whitehall HUD's reference to a "Joint Venture Buyout," that support is counterweighed by the Defendants' denial of such an agreement and the Court's inability to conclude that Tiffany, a former loan officer and the individual making financial decisions on behalf of the Trust, failed to make and retain a copy of the document -- the very document upon which much of the Debtor's case relies. Furthermore, the Debtor's arguments are premised on Hallinan's insistence that the Debtor execute the Deed in Lieu which Hallinan then allegedly parlayed into a joint venture agreement for Hallinan's benefit. But here is an inconsistency that was not explained at trial. The funds from the Whitehall loan were not paid to *Hallinan.* They were paid to *Regional.*

13

For the foregoing reasons, the Debtor has failed to prove any damages resulting from its execution of the Deed in Lieu in favor of Hallinan.  And absent such proof, the Court must enter judgment for the Defendants on Count I.

### B.  Material Misrepresentation and Fraud (Count II)

The Debtor alleges the Defendants engaged in two related acts of misrepresentation and fraud.  As this Court explained in In re Access Cardio Systems, Inc.,

> [t]o recover for fraud under Massachusetts law, a plaintiff must prove, by a preponderance of the evidence, Compagnie De Reassurance D'Ile De France v. New England Insurance Corp., 57 F.3d 56, 72 (1st Cir. 1995), that:  (1) the defendant made a statement; (2) 'the statement was knowingly false;' (3) 'the defendant made the false statement with the intent to deceive;' (4) 'the statement was material to the plaintiffs' decision;' (5) the plaintiffs reasonably relied on the statement;' and (6) 'the plaintiffs were injured as a result of their reliance.' Kenda Corp. v. Pot O'Gold Money League, 329 F.3d 216, 225 (1st Cir. 2003) (quotations omitted).

404 B.R. 593, 638-39 (Bankr. D. Mass. 2009).  A party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).[13]  The Debtor failed to sufficiently plead each element of fraud in the Complaint; however, at this juncture, the Court must consider whether the testimony presented at trial was sufficient to find in favor of the Debtor on its claim for misrepresentation and fraud.[14]

---

[13] Fed. R. Civ. P. 9(b) is made applicable to this adversary proceeding by Rule 7009(b).

[14] "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue." Fed. R. Civ. P. 15(b)(2) (made applicable to this adversary proceeding by Rule 7015(b)(2)).

The Debtor alleges that Hallinan made a material misrepresentation and acted fraudulently by requiring the Debtor to execute and deliver the Deed in Lieu contemporaneously with the Hallinan Mortgage and by representing or implying that the Deed in Lieu was valid.  The Debtor also claims that when Hallinan later threatened to record the Deed in Lieu to induce the Debtor to execute the joint venture agreement, Hallinan repeated that material misrepresentation.

Taken together, the first two elements of fraud require a showing that Hallinan made a knowingly false statement.  It is the Debtor's contention that requiring the Debtor to sign an invalid Deed in Lieu as a condition to receiving the Hallinan loan was tantamount to making a knowingly false statement.  That Hallinan required the Deed in Lieu as a condition to the Debtor receiving a loan is not in dispute.  However, even were the Court to accept Hallinan's actions as the making of a false statement (quite a stretch), there is no basis for a finding that Hallinan was aware of the actual (in)validity of the Deed in Lieu.  The First Circuit has held that, " '[k]nowledge' for the purpose of showing fraud can be established by any of [the] three conditions" enumerated by Restatement (Second ) of  Torts § 526.  <u>Cummings v. HPG Int'l, Inc.</u>, 244 F.3d 16, 23 (1st Cir. 2001).  According to Restatement (Second) of Torts § 526:

> A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

<u>Id.</u> (quoting Restatement (Second) of Torts § 526).

At trial, Attorney Tassoni testified that he had discussed with Regional the implications of the Deed in Lieu.  Specifically, Attorney Tassoni testified that he "had

suggested that the deed in lieu of foreclosure -- that the creditors' remedy was in the mortgage and that the deed in lieu of foreclosure may not be effective." Trial Tr. day 3, 21:6-9, Oct. 28, 2011.   Giuttari testified that he communicated Attorney Tassoni's concern to Hallinan.   But Attorney Tassoni's admonitions alone, made in the form of a warning, was hardly legal dogma and does not demonstrate that Hallinan knew that the Deed in Lieu was ineffective.

And even if the Debtor had established that Hallinan made a knowingly false statement -- the representation that the Deed in Lieu was a valid document -- with the intent to deceive the Debtor, the Debtor has not shown that this representation was in fact material to *its* decision to sign the Hallinan Note and Mortgage.   Whether or not the Deed in Lieu was effective, the Debtor would no doubt still have executed the loan documents.[15]

The only conceivable reliance to which the Debtor can point is the suggestion that, absent the Deed in Lieu, it would not have executed the joint venture agreement or given the Whitehall Mortgage.   But this Court has already found that the Debtor has failed to prove the existence of the joint venture agreement; similarly, it has already found that the Whitehall loan was unrelated to the Deed in Lieu and its proceeds constituted a source of payment to Regional for its services rendered.

The Debtor has failed to prove its claim of fraud by the Defendants.   Therefore, the Court must enter judgment in favor of the Defendants on Count II of the Complaint.

---

[15] Tiffany testified that she knew it would be very difficult to get 100% financing from institutional lenders – that the money would have to come from "hard money" lenders such as Hallinan and that's what Hallinan gave them.

### C.  Fraudulent Transfer under 11 U.S.C. § 548 and M.G.L. ch 109A (Counts IV and V)

In Counts IV and V, the Debtor seeks to avoid as a fraudulent transfer the Debtor's payment of $117,839.17 to Regional for fees which the Debtor claims it never agreed to pay and for which the Debtor says it received less than equivalent value. Section 548 of the Bankruptcy Code allows a debtor in possession to avoid certain transfers and provides in relevant part:

(a)(1) The trustee[16] may avoid any transfer … of an interest of the debtor in property … that was made … within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —
…

(B)(i) received less than a reasonably equivalent value in exchange for such transfer … and
…

(ii)(i) was insolvent on the date that such transfer was made … or became insolvent as a result of such transfer …;

(II) was engaged in business or a transaction … for which any property remaining with the debtor was an unreasonably small capital; [or]

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
…

11 U.S.C. § 548(a)(1)(B).  Similarly, the Debtor's claim for fraudulent transfer under the Massachusetts statute requires the Debtor to show that the transfer was made

(2) without receiving a reasonably equivalent value in exchange for the transfer … and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

---

[16] With exceptions not here relevant, 11 U.S.C. § 1107 gives trustee status to debtors in possession.  See 11 U.S.C. § 1107(a).

(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Mas. Gen. Laws ch. 109A, § 5(a)(2). Accordingly, under either statute, the Debtor must show, *inter alia*, that in exchange for the $117,839.17 payment to Regional, the Debtor "received less than a reasonably equivalent value."

It is undisputed that the proceeds of the Whitehall loan were paid to Regional. However, the parties' testimony diverges on *why* that payment was made.[17]   According to Giuttari, the purpose of the Whitehall loan was to pay Regional's current and outstanding fees incurred in connection with the various loans made to the Carrs and the Debtor that were brokered and serviced by Giuttari. If the Debtor says that the payment constituted a fraudulent transfer, the Debtor must then show that the services rendered to the Debtor by Regional were not equivalent to the $117,839.17 paid.

Contrary to the Debtor's position at trial, it is not Regional's burden to establish

---

[17] The Debtor's testimony diverges even further on why that payment was made depending under which count of the Complaint the Debtor is arguing. Under *this* Count, the Debtor throws out both explanations. The Debtor's first explanation:

[t]he payment of $117,839.17 was made without fair or any consideration … on account of an improperly requested and granted deed in lieu of foreclosure and subsequent documents.

The Debtor's second explanation:

[t]he payment of $117,839.17, to the extent it was to Regional…, was without fair or any consideration on account of fees for which the Debtor and any other entity related to the Debtor and its insiders had never agreed to pay, nor was it for any value received by the Debtor or any other entity related to the Debtor and its insiders.

See Debtor's Proposed Findings. The first explanation suggests that the payment was made to Hallinan as a result of its alleged threat to record the Deed in Lieu; the second suggests that the payment was made to Regional in excess of what it was owed. The Court does not quarrel with Debtor's positing of alternative theories; indeed, parties may argue in the alternative. But the Court is not free to find *facts* in the alternative.

the value of its services.  In re Charles River Press Lithography, Inc., 381 B.R. 421, 424

(Bankr. D. Mass. 2008) ("the [t]rustee bears the burden of proving that the services

rendered were of less than a reasonably equivalent value to the payments made" and

"[t]he absence of detailed time records does not supply that proof"); In re Tri-Star

Technologies Co., Inc., 260 B.R. 319, 323 (2001) (citations omitted) ("The Trustee

carries the burden of proving each of the … elements [of a fraudulent transfer claim] by

a preponderance of the evidence.").

No written fee agreement between Regional and the Debtor or between Regional

and Hallinan was produced at trial.  The Debtor did not dispute that it did receive *some*

services, but offered no testimony relative to what payment should have been made to

Regional and from what source.  Guittari did suggest in his testimony that Regional was

paid the $117,839.17 for services to the Debtor *and* the Debtor's affiliates.  If some of

the payment from the Debtor was made for services rendered to the Debtor's affiliates,

then there may indeed have been a fraudulent transfer from the Debtor to Regional.

But it was the Debtor's burden to show whether such a transfer occurred and how much

the Debtor may have paid for the obligations of others.  This Court has previously held

that "[i]t is not necessary that there be an exact exchange in order to establish

reasonably equivalent value," In re Tri-Star Technologies, Co., Inc., 260 B.R. at 326,

and without a demonstration that the Debtor received from Regional a benefit of lesser

value than the $117,836.17 paid to Regional, all of the Debtor's theories with respect to

claims of fraudulent transfer, whether under § 548 of the Bankruptcy Code or M.G.L. ch.

109A, necessarily fail.

### D.  Violation of Chapter 93A (Count III)

The Debtor alleges a claim under Chapter 93A, which provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Mass. Gen. Laws ch. 93A, § 2(a).  It is the Debtor's contention that Hallinan violated that statute by requiring the Debtor to execute the Deed in Lieu.  To state a claim under Chapter 93A,

> 'some form of deceptive or unfair conduct must be alleged.' <u>States Res. Corp. v. The Architectural team, Inc.</u>, 433 F.3d 73, 84 (1st Cir. 2005). '[A] practice or act will be unfair under [Chapter 93A] if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.' <u>Morrison v. Toys 'R' Us, Inc.</u>, 441 Mass. 451, 457, 806 N.E.2d 388, 392 (2004) (quotations omitted). 'A practice may be deceptive if it reasonably could be found to have caused the plaintiff to act differently than he otherwise would have acted.' <u>Duclersaint v. Fed. Nat'l Mortg. Ass'n</u>, 427 Mass. 809, 814 696 N.E.2d 536, 540 (1998).

<u>Akar v. Federal Nat. Mortg. Ass'n</u>, at *21.  Because the Court has found in favor of the Defendants on each of the other substantive counts of the Complaint alleging the same misconduct, the Debtor has failed to establish that the Defendants engaged in unfair or deceptive acts as contemplated by Chapter 93A.  And, again, the Debtor has not established that it suffered any damages as a result of the Defendants' alleged improper conduct.  Accordingly, the Court must enter judgment in favor of the Defendants on Count III of the Complaint.

### E.  Punitive Damages (Count VI)

The Debtor has not demonstrated any right to compensatory damages.  For the same reasons as set forth above, it has not demonstrated a right to an award of punitive damages.

IV.    CONCLUSION

Because the Debtor has failed to carry its burden of proof with respect to any of its theories of relief against the Defendants, this Court will enter judgment in favor of the Defendants on all counts of the Complaint.

An order consistent with this memorandum will issue accordingly.


DATED:  July 10, 2012                          By the Court,



_____
                                                Henry J. Boroff
                                                United States Bankruptcy Judge